IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| DENNIS E. C., JR.,[1] | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 19-cv-887-RJD[2] |
| | ) |
| COMMISSIONER of SOCIAL SECURITY, | ) |
| | ) |
| Defendant. | ) |
| | ) |

**MEMORANDUM AND ORDER**

**DALY, Magistrate Judge:**

In accordance with 42 U.S.C. § 405(g), Plaintiff, represented by counsel, seeks judicial review of the final agency decision denying his application for Disability Insurance Benefits (DIB) and Supplemental Income Security (SSI) benefits pursuant to 42 U.S.C. § 423.

**Procedural History**

Plaintiff applied for disability benefits in June 2016, alleging disability as of November 1, 2014.  After holding an evidentiary hearing, an ALJ denied the application on October 18, 2018. (Tr. 13-23).  The Appeals Council denied review, and the decision of the ALJ became the final agency decision.  (Tr. 1).  Administrative remedies have been exhausted and a timely complaint was filed in this Court.

---

[1] In keeping with the court's practice, Plaintiff's full name will not be used in this Memorandum and Order due to privacy concerns.   See, Fed. R. Civ. P. 5.2(c) and the Advisory Committee Notes thereto.

[2] This case was assigned to the undersigned for final disposition upon consent of the parties pursuant to 28 U.S.C. §636(c).  See, Docs. 11 & 21.

**Issues Raised by Plaintiff**

Plaintiff raises the following points:

1. The ALJ erred by basing the RFC assessment on the opinions from the State agency medical consultants and therefore played doctor.

2. The ALJ ignored evidence pertinent to the RFC assessment.

**Applicable Legal Standards**

To qualify for DIB or SSI, a claimant must be disabled within the meaning of the applicable statutes.[3] Under the Social Security Act, a person is disabled if he has an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(a).

To determine whether a plaintiff is disabled, the ALJ considers the following five questions in order: (1) Is the plaintiff presently unemployed? (2) Does the plaintiff have a severe impairment? (3) Does the impairment meet or medically equal one of a list of specific impairments enumerated in the regulations? (4) Is the plaintiff unable to perform his former occupation? and (5) Is the plaintiff unable to perform any other work? 20 C.F.R. § 404.1520.

An affirmative answer at either step three or step five leads to a finding that the plaintiff is disabled. A negative answer at any step, other than at step three, precludes a finding of disability. The plaintiff bears the burden of proof at steps one through four. Once the plaintiff shows an

---

[3] The statutes and regulations pertaining to DIB are found at 42 U.S.C. § 423, et seq., and 20 C.F.R. pt. 404. The statutes and regulations pertaining to SSI are found at 42 U.S.C. §§ 1382 and 1382c, et seq., and 20 C.F.R. pt. 416. As is relevant to this case, the DIB and SSI statutes are identical. Furthermore, 20 C.F.R. § 416.925 detailing medical considerations relevant to an SSI claim, relies on 20 C.F.R. Pt. 404, Subpt. P, the DIB regulations. Most citations herein are to the DIB regulations out of convenience.

inability to perform past work, the burden then shifts to the Commissioner to show that there are jobs existing in significant numbers in the national economy which plaintiff can perform. *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001).

It is important to recognize that the scope of review is limited. "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive. . . ." 42 U.S.C. § 405(g). Thus, this Court must determine not whether plaintiff was, in fact, disabled at the relevant time, but whether the ALJ's findings were supported by substantial evidence and whether any errors of law were made. *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003). The Supreme Court defines substantial evidence as, "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (internal citations omitted).

In reviewing for "substantial evidence," the entire administrative record is taken into consideration, but this Court does not reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ. *Burmester v. Berryhill*, 920 F.3d 507, 510 (7th Cir. 2019). However, while judicial review is deferential, it is not abject; this Court does not act as a rubber stamp for the Commissioner. See, *Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010), and cases cited therein.

### The Decision of the ALJ

The ALJ followed the five-step analytical framework described above. She determined that Plaintiff had not worked at the level of substantial gainful activity since the alleged onset date. He was insured for DIB through June 30, 2018.

The ALJ found that Plaintiff had severe impairments of obesity, degenerative disc disease

with radiculopathy, and tendinitis of the left shoulder.

The ALJ found Plaintiff had the residual functional capacity (RFC) to:

> Perform light work…except the claimant can stand/walk for 2 hours in an 8 hour day, and can sit for 6 hours in an 8 hour day. The claimant can never climb ladders, ropes, or scaffolds, and can occasionally climb ramps or stairs. The claimant can occasionally balance, stoop, kneel, crouch, or crawl. The claimant can tolerate no more than occasional exposure to pulmonary irritants and hazards, unprotected moving mechanical parts, or unprotected heights. The claimant can occasionally reach overhead with the left upper extremity, which is the dominant extremity.

(Tr. 18-19).

Plaintiff is unable to perform any past relevant work. Based on the testimony of a vocational expert, the ALJ concluded that Plaintiff was not disabled because he was able to do jobs that exist in significant numbers in the national economy.

## The Evidentiary Record

The Court has reviewed and considered the entire evidentiary record in formulating this Memorandum and Order. The following summary of the record is directed to Plaintiff's arguments.

### 1. Agency Forms

Plaintiff was born in 1978 and was 39 years old on the date of the ALJ's decision. (Tr. 214). He worked as a freight handler in the "warehouse industry" from 2001 to 2004. He worked as a janitor for a janitorial service from 2008 to 2011 and worked as a "laborer" for temp agencies between 2013 and 2014. (Tr. 206).

In a Function Report submitted in August 2015, Plaintiff said the pain he feels in his back and leg is "just too[sic] much." Plaintiff said he cannot stand or sit for too long, cannot mow the lawn, and cannot provide for himself. Plaintiff said he cannot sleep on his back and he constantly

tosses and turns at night. Plaintiff said his conditions affect his ability to dress, bathe, and clean himself, and he only makes meals that take thirty minutes or less to prepare. Plaintiff said he does not do much house or yard work because his back pain is too much to handle. Plaintiff said he liked fishing, video games, and paintball, but he does not fish or do paintball anymore due to his conditions. Plaintiff said his conditions affect his lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, stair climbing, and task completion. Plaintiff said he can walk forty to fifty feet before stopping for thirty minutes, and he uses an unprescribed cane when he goes outside his house. (Tr. 190-95).

### 2. Evidentiary Hearing

Plaintiff was represented by an attorney at the evidentiary hearing in June 2018. (Tr. 29).

Plaintiff said he lifted a maximum of twenty pounds while working as a janitor. (Tr. 37). While working in freight handling at a warehouse, Plaintiff lifted one hundred pounds at maximum. (Tr. 39). Plaintiff said he was in agony ever since 2014 when he fell out of bed while sleeping. (Tr. 39, 49). Plaintiff said standing and sitting are the most significant problems he has because of his back. Plaintiff said he underwent injections that were unhelpful, and he did not complete physical therapy because it became too much. Plaintiff said he uses a "long back scratcher" to pick up his clothes to put them on so he does not have to bend over or reach. His cousin, Ricardo, will help Plaintiff get up if he falls, will lift heavy things for Plaintiff, and works full time. (Tr. 40-42).

During a usual day, Plaintiff said he rotates between lying down and standing up. Plaintiff said he used an unprescribed cane on and off for six years. Plaintiff said he twisted four vertebrae in his back about ten years prior to his alleged onset date and was consequently fired due to the

injury.  Plaintiff said his back condition worsened over time, and it got much worse two years later.  (Tr. 42-43).  His back will lock up on him, and Icy Hot and heating pads do not help anymore.  He gained two hundred pounds since his issues began due to nerves, anxiety, being unable to work and provide for himself.  Plaintiff said he has sleep apnea and uses a CPAP for it and, although the CPAP helps, his sleep is still interrupted due to his back pain.  He has an enlarged liver due to nonalcoholic cirrhosis, but he does not experience current symptoms.  He previously had a heart monitor due to venous insufficiency but has not had any heart treatment besides undergoing an angioplasty.  (Tr. 44-48).  His back pain radiates all the way down his right leg and into his foot.  He has frequent edema in his lower extremities, and he elevates his legs to help it.  (Tr. 50-51).  He can only walk about a half block before stopping due to pain.  (Tr. 53).

A vocational expert (VE) also testified.  The ALJ asked him a hypothetical question which corresponded to the ultimate RFC findings.  The VE testified that a person with Plaintiff's RFC would be limited to sedentary work due to a standing/walking limitation.  The VE testified that this person could do sedentary jobs such as a hand packer, production worker assembler, and an inspector test sorter.  (Tr. 55).

### 3. Relevant Medical Records

#### *Cancer Care Specialists of Illinois*

Plaintiff presented to Bassam Maalouf, an oncologist, on March 9, 2017.  (Tr. 542).  Plaintiff reported fatigue, decreased energy levels, and shortness of breath with activity.  (Tr. 643).  Dr. Maalouf noted, "…the most likely cause for his hepatosplenomegaly is underlying nonalcoholic steatohepatitis and fatty liver…with no major worsening."  A physical exam

revealed morbid obesity and no edema. The assessment included hepatosplenomegaly[4], and plans included blood tests. (Tr. 542).

### *Center for Gastrointestinal Health*

Plaintiff presented to Shakeel Ahmed nine times between July 2016 and May 2017 for follow-up appointments. (Tr. 449, 465, 467, 470, 473, 476, 478, 480, 547). Plaintiff reported lack of energy; shortness of breath; swollen feet; arthritis; joint pain; muscle aches; and no edema. (Tr. 449-50, 467, 470). Physical examinations revealed no edema. (Tr. 450, 466, 468, 471, 474, 477, 479, 481, 548). Assessments included nonalcoholic steatohepatitis[5] and hepatosplenomegaly. (Tr. 450, 466, 468, 471, 474, 477, 479, 481, 549). Plans included blood testing; monitoring; liver and spleen scans; checking enzymes; and dietary and behavioral guidelines. (Tr. 450, 466, 468, 471, 474, 477, 479, 481, 484, 486-87, 534, 548).

On September 13, 2016, Dr. Ahmed said the liver and spleen scan revealed no significant shift, borderline hepatomegaly[6], and splenomegaly[7]. (Tr. 481).

### *Gateway Pulmonology*

Plaintiff presented to Rajeev Varma, Mohammad Jarbou, and Sarah Alderman, pulmonologists, and Emily Cottrell, a nurse practitioner, eleven times between March 2016 and April 2018 and underwent sleep studies and follow-ups for obstructive sleep apnea syndrome. (Tr. 280, 337, 343, 382, 385, 504, 508, 514, 558, 693, 709). Plaintiff reported doing well; loud

---

[4] Hepatosplenomegaly is defined as, "enlargement of the liver and spleen." https://medical-dictionary.thefreedictionary.com/hepatosplenomegaly, visited on June 3, 2020.
[5] Nonalcoholic steatohepatitis is defined as, "A fatty liver." https://medical-dictionary.thefreedictionary.com/NASH, visited on June 3, 2020.
[6] Hepatomegaly is defined as, "enlargement of the liver." https://medical-dictionary.thefreedictionary.com/hepatomegaly, visited on June 3, 2020.
[7] Splenomegaly is defined as, "enlargement of the spleen." https://medical-dictionary.thefreedictionary.com/splenomegaly, visited on June 3, 2020.

snoring; daytime fatigue and tiredness despite successful CPAP usage; a decrease in daytime hypersomnia; dry mouth upon awakening; weight gain; good sleep; increased daytime energy; shortness of breath with exertion and walking; sleep apnea; and exercise intolerance.  (Tr. 281, 387, 504, 508-09, 514, 558, 695, 711).  Some of Plaintiff's examinations were normal and revealed no edema.  (Tr. 281-82, 384, 387, 505, 509, 559, 711).  Others revealed morbid obesity; expiratory wheezing; decreased breath sounds; and 2+ radial pulses.  (Tr. 505, 509, 515, 695).  Assessments included obstructive sleep apnea syndrome, asthma, and severe obesity.  (Tr. 282, 384, 387, 505, 509, 515, 559, 695, 711).  Recommendations and plans included testing; a second CPAP titration; CPAP use; weight loss; an upper airway assessment; a testosterone level check; avoidance of sedatives and alcohol; medication if residual tiredness and excessive daytime sleepiness continued; healthy eating; exercise; continued physical therapy for back issues; and follow-ups.  (Tr. 282, 338, 343-44, 387, 505, 509, 515, 517, 559, 695).

The impression of the sleep study performed on April 26, 2016, was severe obstructive sleep apnea syndrome.  (Tr. 343).  Dr. Varma ordered a CPAP for Plaintiff on May 19, 2016.  (Tr. 339).  Dr. Varma noted Plaintiff's CPAP titration sleep study on May 18, 2016, was excellent.  (Tr. 284).

### *Gateway Regional Medical Center*

Plaintiff underwent numerous tests, procedures, and imagining studies at Gateway Regional Medical Center between July 2015 and January 2018.  (Tr. 335, 452, 678, 699, 767).

Plaintiff underwent a hip x-ray on July 28, 2015, and the impression was, "1. No radiographic evidence of bone and joint disease of the right hip."  Plaintiff also underwent a lumbar spine x-ray, and the impression was, "1. Mild multilevel degenerative, hypertrophic

changes." Plaintiff also underwent a chest x-ray, and the impression was, "1. Artifact versus a small middle lobe or lingular infiltrate. Follow-up two-view chest radiograph will prove beneficial." (Tr. 359-61).

Plaintiff underwent an echocardiogram on July 31, 2015, and the conclusion was, "1. Normal systolic left ventricular function with ejection fraction 64%. 2. Mild Left Ventricular Hypertrophy." (Tr. 358).

Plaintiff underwent a chest x-ray on September 16, 2015, and the impression was, "Mild cardiomegaly[8] otherwise unremarkable two views of the chest." (Tr. 356).

Plaintiff underwent a pulmonary function test on October 23, 2015, and the impression was, "…Overall impression is relatively normal pulmonary function test with some mild air trapping and elevated airway resistance." (Tr. 350).

Plaintiff underwent an MRI of his spine on November 11, 2015. Plaintiff reported low back pain with pain going down his right leg after a twisting injury in September 2015. (Tr. 346-47). The impression was, "1. DEGENERATIVE DISC CHANGES AT L3-4, L4-5, AND L5-S1. 2. RIGHT PARAMEDIAN L4-5 SMALL PROTRUSION SPUR COMPLEX WITH A MILD-TO-MODERATE RIGHT L5 SOFT TISSUE LATERAL RECESS STENOSIS[9] AND A MILD-TO-MODERATE RIGHT L4 FORAMINAL STENOSIS. 3. INCIDENTAL SPLENOMEGALY." (Tr. 348).

Plaintiff underwent an abdominal ultrasound on January 5, 2016, and the results were, "Splenomegaly is seen…No ultrasonographic evidence of focal abnormality is seen in the spleen."

---

[8] Cardiomegaly is defined as, "abnormal enlargement of the heart." https://medical-dictionary.thefreedictionary.com/cardiomegaly, visited on June 3, 2020.

[9] Stenosis of the spine is defined as, "any narrowing of the spinal canal that causes compression of the spinal nerve cord." https://medical-dictionary.thefreedictionary.com/spinal+stenosis, visited on June 3, 2020.

(Tr. 345).

Plaintiff underwent a chest x-ray on July 6, 2016, and the impression was, "No acute cardiopulmonary process identified."   (Tr. 335).

Plaintiff underwent a liver and spleen scan on August 17, 2016, and the impression was, "1. Splenomegaly, borderline hepatomegaly. No focal masses."   (Tr. 452).

Plaintiff underwent a cardiac catheterization on September 11, 2017.   He presented with complaints of shortness of breath, chest pain with minimal exertion, and hypertension.   The conclusion was, "1. Elevated right atrial pressure, which is consistent with the patient sleep apnea. The patient states that he is using his CPAP mask. 2. No evidence of significant CAD. 3. Normal renal arteries. 4. Normal ejection of 60%."   (Tr. 767).

Plaintiff presented to Carla Buzan, a physical therapist, on November 27, 2017, due to lumbar radiculopathy[10].   Plaintiff reported pain in his lower back that travels down his right leg and sometimes occurs in the left leg and increased pain with coughing, sneezing, ambulation, work, and recreation.   (Tr. 678).   PT Buzan observed posture faults, decreased range of motion, and decreased flexibility.   Plans included returning to physical therapy two times weekly for three to four weeks.   (Tr. 680).

Plaintiff underwent a pulmonary function test on January 16, 2018.   The impression was, "No significant obstruction or restriction seen. Mildly reduced diffusion capacity. In the absence of anemia or pulmonary hypertension, lung disease cannot be ruled out. Clinical correlation is advised."   (Tr. 699).

### *Southern Illinois Healthcare Foundation*

---

[10]   Radiculopathy   is   defined   as,   "disease   of   the   nerve   roots."   https://medical-dictionary.thefreedictionary.com/radiculopathy, visited on June 3, 2020.

Plaintiff presented to Oladele Ajao, an internal medicine physician, thirteen times between July 2015 and September 2017.  (Tr. 311, 314, 316, 318, 321, 323-25, 328, 773, 776, 781, 798, 804).  At these appointments, Plaintiff reported shortness of breath; leg swelling; sharp, severe, chronic, worsening back pain that interferes with work and sleep, radiates to the buttocks and down his legs, and is a seven to eight out of ten; not benefitting from physical therapy for his back; sleeping with a cane at his bedside; inability to stand at the kitchen sink for more than five minutes; daily, irregular, rapid and sustained palpitations with isolated skips and mild fluttering; mild, constant edema without relief; and no edema at times.  (Tr. 317, 319, 321, 329-30, 775, 783, 806).  Plaintiff reported rest alleviates the back pain, and movement and flexing aggravate it.  (Tr. 775, 800).

Physical examinations revealed obesity; distress; musculoskeletal tenderness; sometimes edema, no edema, and "edema (2+)"; spine tenderness on palpation; spinal reduced range of motion; and regular cardiovascular rate and rhythm.  (Tr. 313, 316, 318, 321, 323, 325, 327, 330-31, 776, 780, 784, 801, 807).  Assessments included disorder of the back; hip pain; dyspnea on exertion; obesity; hyperlipidemia; splenomegaly; benign hypertension; edema; chronic back pain; palpitations; apnea; degeneration of lumbar intervertebral disc; spinal stenosis of the lumbar region; spasm of back muscles; abnormal cardiovascular stress test; and cardiomegaly.  (Tr. 311, 314, 316, 319, 321, 323-25, 328, 776, 780, 784, 801, 807).  Plans included blood tests; urine tests; x-rays; an MRI; a hematology referral; a cardiology referral; a neurosurgery referral; a sleep medicine referral; diet changes; ultrasounds; ambulatory readings; seeing an interventional pain management specialist; controlling the hypertension; seeing Dr. Mahmud for splenomegaly; injections; and medications.  (Tr. 311, 314, 316, 319, 321, 323-25, 328, 776, 780, 784, 801, 807).

*St. Elizabeth's Hospital*

Plaintiff presented to Kristina Naseer, a pain management specialist, on February 23, 2016, complaining of low back pain and right leg pain. Plaintiff reported back pain radiating down his right leg and occasionally down his left leg. The pain started in November 2004 after a twisting injury that developed into degenerative disc disease and spinal stenosis. Plaintiff described the pain as shooting, dull, sharp, throbbing, aching, and like an electric shock, and he rated it at a nine out of ten on average. Rolling in bed, standing, sexual activity, exercise, taking stairs, sitting, moving from sitting to standing, cold, lying down, weather changes, walking, stress, and fatigue all worsen the pain. Lying down, massage, relaxation, and heat all relieve the pain. (Tr. 413). A physical exam revealed ambulation with a slightly antalgic gait favoring the right lower extremity and tenderness present to deep palpation across lumbar facets. The impression included lumbar radiculopathy and lumbar degenerative disk disease. Recommendations included epidural injections. (Tr. 414).

Plaintiff underwent five injections between June 2016 and January 2017 to address low back pain. (Tr. 426, 437, 550, 556, 565).

*St. Louis Heart and Vascular*

Plaintiff presented to Gibran Mahmud, a hematologist, and Gil Vardi, a cardiologist, seven times between February 2016 and November 2017. (Tr. 286, 292, 297, 511, 723). Plaintiff reported fatigue; sleep disorder; dyspnea at rest and on exertion; back pain; joint pain; joint swelling; muscle cramps; muscle weakness; arthritis; sciatica; restless legs; leg pain at night and with exertion; peripheral edema; stiffness; palpitations; shortness of breath; and occasional chest pain worse with exertion. (Tr. 287, 292-93, 297, 511, 723-24). Plaintiff also noted incidental

splenomegaly was noted in an MRI of the lumbar spine from November 2015. (Tr. 286). Physical examinations revealed morbid obesity; no edema; "2+ left pedal edema and 2+ right pedal edema"; "2+b/l LE edema"; and a palpable spleen. (Tr. 288-89, 294-95, 299, 725-26, 730, 737, 743). Dr. Vardi noted Plaintiff's stress test showed evidence of ischemia[11], the echo showed normal ejection fraction, the renal artery duplex was normal, the venous duplex showed insufficiency, and his bloodwork was unremarkable. (Tr. 511). Impressions included an abnormal nuclear stress test; palpitations; chest pain; shortness of breath; hypertension; obstructive sleep apnea; morbid obesity; peripheral edema; splenomegaly; and hepatomegaly. (Tr. 289-90, 295, 300, 726, 731, 738, 744). Plans included conservative management; testing; ultrasounds; a gastroenterology referral; liver and spleen scans; an echo; renal artery duplex; stress myoview; iron studies; a CT angiography or radial catheterization; weight loss advisement; and medications. (Tr. 289-90, 295, 300, 511, 726, 738, 744).

Plaintiff underwent an abdominal ultrasound on February 24, 2016, due to potential splenomegaly. The impression was, "SPLENOMEGALY WITH MILD HEPATOMEGALY. NO OTHER SIGNIFICANT FINDINGS." (Tr. 304).

Plaintiff underwent an abdominal ultrasound on June 7, 2016, due to splenomegaly and hepatomegaly, and the impression was, "CONTINUED HEPATOSPLENOMEGALY." (Tr. 303).

Plaintiff underwent a transthoracic echocardiogram in July 2017, and the conclusion was, "1. …poor acoustic windows…poor endocardial visualization…Normal left ventricular systolic function. Normal left ventricular size. Normal left ventricular wall thickness. Normal left

---

[11] Ischemia is defined as, "an insufficient supply of blood to an organ, usually due to a blocked artery." https://medical-dictionary.thefreedictionary.com/ischemia, visited on June 3, 2020.

ventricular diastolic function. Left ventricular ejection fraction is estimated at 60%. 2. No significant valvular abnormalities." (Tr. 749-50).

On July 26, 2017, Plaintiff underwent multiple tests including a stress test. (Tr. 574, 578, 580-81). The results of the tests were summarized as, "1. Abnormal myocardial imaging with a normal…exercise tolerance test. 2. There is a partially reversible defect involving the inferior wall consistent with infarct with peri-infarct ischemia. 3. There is also a reversible defect anterior wall consistent with ischemia. 4. Normal left ventricular systolic function with a calculated ejection fraction of 71%." (Tr. 581).

### *St. Louis University Hospital/SLUCare Department of Neurosurgery*

Plaintiff underwent an MRI of his lumbar spine at St. Louis University Hospital on January 6, 2017, due to a history of chronic back pain. (Tr. 587). The impression was, "1. Mild to moderate multilevel degenerative disc and joint disease of the lumbar spine as described above, more pronounced at L4-L5, resulting in up to moderate central canal stenosis." (Tr. 588).

Plaintiff presented to Meghan Talley Glover, a physician assistant at SLUCare Department of Neurosurgery, on July 19, 2017. (Tr. 652). The diagnosis was back pain. (Tr. 655).

Plaintiff presented to PA Glover at SLUCare Department of Neurosurgery to address back pain on November 13, 2017. (Tr. 661). Plaintiff reported the start of his back pain occurred in 2004 after a work-related injury. A chiropractor said Plaintiff's "vertebrae completely twisted around each other." Plaintiff reported falling in 2015 which then caused his bilateral leg pain. Plaintiff said the right leg pain is constant while the left leg pain is intermittent; his back pain increases with sitting, standing, and exertion; he must constantly change positions to get comfortable; and he uses a cane. (Tr. 665). Plaintiff reported fatigue; sleep problems; shortness

of breath; pain with exertion; swelling; joint pain; stiffness; and restricted movement. (Tr. 673). A physical examination revealed mild tenderness along the low lumbar spine. (Tr. 667). The assessment was, "chronic low back pain and lumbar radiculopathy bilaterally (R>L) with up to moderate central canal stenosis at L4-5." He received a physical therapy referral and medications. (Tr. 668).

Plaintiff underwent an MRI of his lumbar spine at St. Louis University Hospital on May 9, 2018. The impression was, "1. Multilevel degenerative disc and joint disease in the lower lumbar spine. 2. Suspected impingement on the traversing left L4 nerve at L3-L4. Traversing left L4 nerve appears slightly larger than before." (Tr. 808).

### 4. Medical Opinions

On August 31, 2016, Victoria Dow, Defendant's medical consultant, said Plaintiff could occasionally lift and/or carry twenty pounds; frequently lift and/or carry ten pounds; stand and/or walk for two hours; sit more than six hours on a sustained basis in an eight-hour workday; and push and/or pull with no limitations other than shown for lifting and/or carrying. (Tr. 65-66). On October 13, 2016, Vidya Madala, another medical consultant for Defendant, was of the same opinion as Dr. Dow. (Tr. 79-81).

### Analysis

Plaintiff argues the ALJ erred by basing the RFC assessment on the opinions from the State agency medical consultants who had not reviewed later MRI reports and in determining the significance of those reports herself.

It is not error to rely on state agency opinions simply because they did not review a later MRI. See *Scheck v. Barnhart*, 357 F.3d 697, 702 (7th Cir. 2004). However, an ALJ should not

"rely on an outdated assessment if later evidence containing new, significant medical diagnoses reasonably could have changed the reviewing physician's opinion." *Moreno v. Berryhill*, 882 F.3d 722, 728 (7th Cir. 2018). Over two years went by between the November 2015 and May 2018 MRI's. An amount of time such as that allows for many new, significant medical observations and diagnoses, as suggested in *Moreno*, and could have changed a reviewing medical opinion. That alone has the potential to change the outcome of a case. Therefore, the Court agrees with Plaintiff's argument here.

Plaintiff argues that the ALJ erred by dismissing the results of the May 9, 2018, MRI by saying it revealed "no evidence of worsening." This Court agrees the ALJ independently interpreted the MRI results. The ALJ did not pull her statement about the May 2018 MRI directly from the radiologist's findings and impressions, but she instead interpreted the MRI results and compared them to the November 2015 MRI. In *McHenry v. Berryhill*, the court decided the ALJ erred by interpreting an MRI himself rather than having a doctor explain the significance. 911 F.3d 866, 871 (7th Cir. 2018). The facts in *McHenry* are similar to the ones at hand. In *McHenry*, the ALJ independently compared MRI results with prior medical records to decipher whether the impairments "actually existed at the same or similar level." *Id*. Here, the ALJ relied on her own interpretation of the MRI by deciding there was "no evidence of worsening" when comparing it to the previous MRI from November 2015. (Tr. 20). The ALJ did not rely on the radiologist's interpretation as set forth in the MRI report but instead interpreted them into her own summary. Therefore, this Court accepts Plaintiff's points here.

Plaintiff also argues the ALJ mischaracterized the results of the MRI. Plaintiff's assertions are correct. The radiologist's impression of the November 2015 MRI said, "1.

DEGENERATIVE DISC CHANGES AT L3-4, L4-5, AND L5-S1. 2. RIGHT PARAMEDIAN L4-5 SMALL PROTRUSION SPUR COMPLEX WITH A MILD-TO-MODERATE RIGHT L5 SOFT TISSUE LATERAL RECESS STENOSIS AND A MILD-TO-MODERATE RIGHT L4 FORAMINAL STENOSIS. 3. INCIDENTAL SPLENOMEGALY."  (Tr. 348).  The radiologist's impression of the May 2018 MRI said, "1. Multilevel degenerative disc and joint disease in the lower lumbar spine. 2. Suspected impingement on the traversing left L4 nerve at L3-L4. Traversing left L4 nerve appears slightly larger than before."   (Tr. 808).   There is no error or mischaracterization of the results when an ALJ simply paraphrases findings straight from the MRI report itself.   However, there is error when the ALJ goes one step further outside the radiologist's findings, compares two MRI's, and opines whether the condition worsened or not.

Plaintiff argues that the ALJ ignored evidence that was pertinent to the RFC assessment, specifically evidence regarding edema and Plaintiff's difficulty to sit and stand.   Plaintiff argues that the ALJ changed the outcome of the case by not mentioning Plaintiff's lower extremity edema and by not asking the VE whether needing to elevate an individual's legs during a workday would impact employment.

The Seventh Circuit has "repeatedly held that although an ALJ does not need to discuss every piece of evidence in the record, the ALJ may not analyze only the evidence supporting her ultimate conclusion while ignoring the evidence that undermines it."   *Moore v. Colvin*, 743 F.3d 1118, 1123 (7th Cir. 2014).   The ALJ must consider all relevant evidence.   See *Golembiewski v. Barnhart*, 322 F.3d 912, 917 (7th Cir. 2003); 20 C.F.R. § 404.1545 (a)(1) and (3).   Moreover, the ALJ must "engage sufficiently" with the medical evidence.   See *Stage v. Colvin*, 812 F.3d 1121, 1125 (7th Cir. 2016).   The ALJ "need not provide a complete written evaluation of every piece of

testimony and evidence." *Curvin v. Colvin*, 778 F.3d 645, 651 (7th Cir. 2015) (citation and internal quotations omitted). However, the ALJ's discussion of the evidence must be sufficient to "provide a 'logical bridge' between the evidence and his conclusions." *Terry v. Astrue*, 580 F.3d 471, 475 (7th Cir. 2009) (citations omitted). The ALJ "cannot simply cherry-pick facts supporting a finding of non-disability while ignoring evidence that points to a disability finding." *Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010).

Defendant argues that, despite the references to instances where 2+ edema was noted, there were multiple examinations in which no edema was noted. Defendant also pointed out how Plaintiff identified no medical recommendations for leg elevation. This Court agrees. The ALJ did not list edema as a severe impairment and explained in her decision that, "Any impairments also mentioned in the record not discussed herein have been considered and were deemed non-severe as they did not have even a minimal impact on the claimant's ability to perform work on a regular and continuing basis at competitive levels of employment." (Tr. 18). There was no need for the ALJ to provide more discussion on Plaintiff's edema as the ALJ believed it was within a category of non-severe impairments. Had the ALJ deemed edema a severe impairment, a more thorough engagement with the evidence would be necessary. However, that is not the case here. Therefore, although medical records indicate the existence of edema issues, the ALJ addressed that non-severe impairments within the record were considered yet did not have a big enough impact to be analyzed within the rest of the ALJ's decision.

This Memorandum and Order should not be construed as an indication that the Court believes Plaintiff was disabled during the relevant period or that he should be awarded benefits. On the contrary, the Court has not formed any opinions in that regard and leaves those issues to be

determined by the Commissioner after further proceedings.

## Conclusion

The Commissioner's final decision denying Plaintiff's application for social security disability benefits is **REVERSED** and **REMANDED** to the Commissioner for rehearing and reconsideration of the evidence, pursuant to sentence four of 42 U.S.C. §405(g).

The Clerk of Court is directed to enter judgment in favor of Plaintiff.

**IT IS SO ORDERED.**

**DATED: June 8, 2020**

*s/ Reona J. Daly*
**Hon. Reona J. Daly**
**United States Magistrate Judge**